UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON BROWN,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>THE ATTORNEY GENERAL OF THE<br>STATE OF CALIFORNIA, et al.,<br><br>　　　　　　Defendants. | Case No.  11-cv-00977-JST<br><br>**ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS;<br>GRANTING CERTIFICATE OF<br>APPEALABILITY** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Napoleon Brown, challenging the validity of a judgment obtained against him in state court.  Respondent filed an answer to the petition and petitioner has filed a traverse.

## I.    PROCEDURAL HISTORY

On May 10, 2005, a San Francisco County jury found petitioner guilty of murder (Cal Penal Code § 187(a)[1]), four counts of robbery (§ 212.5) and carjacking (§ 215) and found true robbery and carjacking felony-murder special circumstances (§ 190.2(a)(17)(A) & (L)) and personal use of a firearm and arming enhancements except as to the carjacking count. (Clerk's Transcript ("CT") at 1834-35.)  The trial court granted petitioner a new trial on the murder count and he was sentenced to 44 years and fourth months on the other counts.  (CT at 2112, 2148.)

Petitioner directly appealed the judgment in the California Court of Appeal.  On July 21, 2009, in a reasoned opinion, the California Court of Appeal affirmed the judgment and the order

_____

[1] Except as otherwise specified, all statutory references herein are to the California Penal Code.

United States District Court<br>Northern District of California

1   granting petitioner's motion for a new trial on the murder charge.  (Ex. 13.[2])  On October 28, 2009,

2   the California Supreme Court summarily denied the petition for review.  (Ex. 15.)  Petitioner's

3   state habeas petitions were denied.  On November 29, 2011, the prosecution amended the murder

4   charge to involuntary manslaughter and petitioner pled no contest to involuntary manslaughter and

5   was resentenced to a total term of 42 years and four months in state prison on all counts.  (Ex. 21.)

6   The operative first amended petition in this case was filed on January 26, 2012.[3]

7   **II.     STATEMENT OF FACTS**

8          The following background facts describing the crime and evidence presented at trial are

9   from the opinion of the California Court of Appeal.[4]:

10         The Prosecution's Case

12         On June 19, 2000, between 12:00 a.m. and 12:30 a.m., two African-American men entered
       the Johnny Rockets restaurant on Chestnut Street in San Francisco as three employees
13     were closing the store and preparing to leave.  One of the men, later identified by two of
       the employees as [petitioner], was carrying a chrome semi-automatic handgun.  The other
14     wore a red bandana over his face.  The men forced the employees to the basement and
       made them lie face-down on the floor.  The man with the bandana took money from each
15     of the employees while [petitioner] escorted one of the employees to the safe and
       demanded that he open it.  About this time, a fourth employee returned to the restaurant.
16     The man with the bandana forced the employee to join the others in the basement and
       removed money from his pockets.  [Petitioner] removed at least $7,200 from the safe
17     before leaving the restaurant.  Once the men left the premises, the employees called the
       police and reported the robbery.
18

19         Shortly after 12:30 a.m., Officer Gary Watts noticed two African-American men walking
       briskly towards him on Chestnut Street.  One was carrying what appeared to be a red bank
20     deposit bag.  About 30 feet from him, they turned a corner and ran to a parked car in the
       next block that "appeared to be waiting . . . with the taillights on."  The men got into the
21     passenger side of the car, which immediately sped off.  Watts ran to his unmarked police
       car, returned to the area in his car, and saw a vehicle two blocks ahead-the only vehicle in
22     sight.  As he pursued the car, he heard a radio dispatch concerning the robbery at the
       restaurant.  He relayed what he had seen and reported that he was in pursuit of a car with
23     the license plate number 4JLK910, later determined to be a Ford Escort.  As the car
       approached the Golden Gate Bridge, Watts pulled next to it.  He saw an African-American

25  _____

26  [2] All references herein to exhibits are to the exhibits submitted by respondent in support of the
    answer.
27  [3] This petition only discusses the robbery and carjacking convictions.
    [4] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir.
28  2002); 28 U.S.C. § 2254(e)(1).

man in the passenger seat and an African-American woman driving the car. He could not see into the back seat because of the heavily tinted rear windows. Watts sped past the Ford and called for the Highway Patrol to stop the car. Watts waited in the bridge parking lot for the Ford to pass him and followed it on to the bridge. He did not activate his lights or attempt to stop the car.

Suddenly, the Ford pulled into the buffer lane in the center of the bridge and stopped. Watts stopped his car about 75 feet behind the Ford. The driver's side door of the Ford opened and the female driver fell out, as if she had been pushed or kicked from the car. She tried to break the fall with her hands and rolled into the oncoming lane of southbound traffic, where she lay face-down, crying hysterically. As Watts got out of his car, a man exited the passenger side of the Ford. Watts yelled for him to "get down on the ground" but he ignored the command, entered the driver's seat of the Ford and drove off. Watts had "no doubt" that the man he saw was codefendant Thorn. He could not see into the car and did not know if [petitioner] was in the back seat.

As the car drove away, Watts saw headlights approaching in the southbound direction and yelled for the female to get up. The woman, later identified as Lenties White, did not rise from the pavement before being struck by the oncoming car, which did not break or swerve before hitting her. Using videotape from the bridge surveillance cameras, Watts estimated that approximately 19 to 24 seconds elapsed from the time he pulled up behind the Ford until White was hit by the oncoming car.

At 12:57 a.m., Watts broadcast that the woman had been hit and that the robbery suspects were headed towards Marin. Minutes later three additional officers arrived on the bridge. Officers Michele Aschero and Keith Pasquinzo approached White, who was lying gravely injured on the road. Aschero asked the woman her name and date of birth and the woman identified herself as Lenties White with a birth date of May 17, 1975. When Aschero asked her what had happened, White responded that "S.B." "threw me out of the car." The officers asked her to repeat the identity, and both officers clearly heard her say "S.B." White also told the officers that S.B. lived at the intersection of McAllister and Fillmore and she asked them to contact her mother Sandra McNeil. The paramedic who responded to the bridge described White's level of consciousness and awareness as "remarkable," noting in his report that despite her traumatic injury, she "remain[ed] oriented times two throughout transport." White died at the hospital later that morning from blunt force trauma and the resulting blood loss. She had a significant amount of cocaine in her system at the time of her death.

Meanwhile, at approximately 1:09 a.m., Highway Patrol Officer Paul Perez spotted the robbery suspect's car traveling northbound on Highway 101 past Marin City. He activated his emergency lights and with four additional patrol cars followed the car on a high speed chase. The car was eventually stopped and the sole occupant, Thorn, was arrested. Inside the Ford, officers located two Johnny Rockets security cards. Thorn had $46 dollars on his person, but no money was found in the car.

At trial, Samantha Jefferson claimed to remember very little about the morning of June 20. Her interviews with the police were admitted as prior inconsistent statements. In those interviews she told police that [petitioner] appeared at her home at approximately 5:00 a.m.

that morning asking about White.  He indicated that he thought something might have happened to her and he told Jefferson to turn on the news because he thought White was dead.  They watched news coverage about the accident on the bridge involving a woman whose identity had not yet been released.   [Petitioner] told her that White had been taken hostage while trying to buy cocaine.  Jefferson told him she did not believe him, but [petitioner] insisted he had nothing to do with White's death.  Jefferson also told the police that [petitioner] used the nickname "S.B."

Kermit Allen was the driver of the car that hit White on the bridge.  When Allen voluntarily surrendered at the toll plaza, officers determined that he was under the influence of alcohol and arrested him.  Allen's blood sample at 3:15 a.m. had an alcohol content of .10 percent.  Highway Patrol Officer McClellen testified that based on his reenactment of the accident, he believed even a sober driver would have struck White.

Police recovered a red bandana in the lobby area of the Johnny Rockets restaurant.  DNA testing matched [petitioner's] DNA to samples taken from the bandana.

On June 20, 2000, Police Inspectors Anthony Camilleri and Antonio Casillas interviewed [petitioner's] sister, London Breed.  She told them that [petitioner] was known as "Sonny" or "Sonny Boy."  She thought he might also use the name "S.B." While the interview was in progress, [petitioner] called Breed and spoke briefly with Camilleri.  He told Camilleri that he used the nicknames "Sonny" and "S.B." and acknowledged that he had been with White the previous night until about 10:00 p.m.  Camilleri urged defendant to come to the police station to make a statement and [petitioner] agreed "to call [him] later to make an appointment."  Breed called later that day, however, and told Camilleri that [petitioner] would not be coming to the station.

Luette Harris, who was with [petitioner] at the time of his arrest, also knew [petitioner] to use the nickname "S.B."  [Petitioner] lived on Eddy Street near Webster, which is about three blocks from McAllister and Fillmore.

On August 6, 2000, [petitioner] was arrested on a warrant.  He tried to flee but was apprehended without incident.

<u>The Defense Case</u>

Dr. Steven Clark testified as an expert on eyewitness identification. He explained that memory tends to fade over time so that an early identification is the most reliable; approximately 20 to 25 percent of the time people make false identifications when viewing a photo or live line-up; and people are generally better at identifying suspects of their own racial or ethnic background than of other backgrounds.  Dr. Scott Frasier opined that it is very difficult to identify a person over a distance of 75 feet.

Dr. Mark Stassberg, a neurologist, opined that based on White's injuries, after the accident she would have been "less than reliable in her recollections and her ability to interact."  Dr. Michael Slade opined that based on what he calculated to be a high level of cocaine in White's system at the time of the accident, her ability to perceive, process information and communicate would have been affected.  He also calculated Allen's blood alcohol level at

4

the time of the accident and opined that his level would have a negative effect on his driving, reaction time, perception and concentration.

White's mother, Sandra McNeil, testified that she did not know Thorn but that she and her daughter had known [petitioner] most of his life. They lived for years in the neighborhood of Fillmore and McAllister Streets. She and White knew him as "Sonny Boy" but neither referred to him as "S.B."

[Petitioner's] sister, London Breed, provided an alibi for defendant. When she arrived at her grandmother's house around midnight on June 18, 2000, defendant was asleep on the couch. She could not remember if he was still there when she left for work in the morning. She denied ever telling the police that defendant used the nickname "S.B."

Kenneth Chappel testified that he had spent all night with Thorn. About 12:45 a.m., they were in Marin City when a car drove up. The driver spoke to Thorn, got out of the car, and then Thorn got into the car and drove away.

Private Investigator Jackson Holland reenacted the suspects' flight from the robbery as recounted by Watts. In the reenactment he could not see the suspects enter the car.

The jury convicted [petitioner] on all counts and found true the special circumstance allegations. The jury found the firearm enhancements true on all counts except for the carjacking. In a bifurcated proceeding, the jury found true [petitioner's] prior serious felony conviction. FN2

FN2. Thorn was acquitted of the robbery, carjacking and murder count but convicted on an additional count of evading a police officer.

On November 18, 2005, [petitioner] moved for a new trial. The motion was denied on January 20, 2006. On February 7, however, [petitioner] filed a renewed motion for new trial and the court indicated that it was reconsidering its prior ruling. On February 27, 2006, the court granted the motion with respect to the murder conviction. [Petitioner] was sentenced on the remaining counts to 44 years, 4 months in prison.

People v. Brown, 2009 WL 2172811, *1-4 (Cal. Ct. App. July 21, 2009).

## III.   DISCUSSION

### A.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed nearly all the claims

United States District Court
Northern District of California

petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein except as noted below.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

**B.     Petitioner's Claims**

As grounds for habeas relief, petitioner claims that: (1) the prosecutor improperly excused several jurors in violation of Batson v. Kentucky, 476 U.S. 79 (1986); (2) the prosecutor improperly used petitioner's decision not to speak with police as evidence of guilt; (3) petitioner's right to confrontation and to present a defense were violated by the trial court's limits on cross-examination of Police Officer Watts; (4) petitioner's right to confrontation and due process were violated by the admission of a hearsay statement the victim made to police before she died; (5) the trial court improperly answered a jury question; (6) one juror's comment to other jurors offering her opinion as a nurse who worked with dying patients violated petitioner's rights; (7) the supplemental jury instructions regarding the gun enhancement was improper; (8) petitioner received ineffective assistance of counsel; and (9) the prosecutor failed to disclose material exculpatory evidence regarding a police officer who testified against petitioner.  The Court addresses each claim in turn.

**1.     Jury Selection**

Petitioner alleges that the prosecution improperly excused five African-American jurors on the basis of race and one on the basis of religion.  (Amended Petition at 4.)

**a.     Background**

The Court of Appeal discussed relevant federal and state legal authority and denied this claim as follows:

> During jury selection, [petitioner] made five motions under People v. Wheeler (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (Wheeler) and Batson v. Kentucky (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (Batson), challenging the prosecutor's use of peremptory challenges against African-American prospective jurors.  The trial court denied each motion and [petitioner] now contends that the court erred in doing so.
>
> . . . .
>
> The trial court denied each of [petitioner's] motions on the ground that he had failed to establish a prima facie case.  At the time of these rulings, our Supreme Court had ruled that

7

the standard for determining whether a prima facie case has been established is whether the record reflects a "strong likelihood" that prospective juror challenges were based on improper discrimination or, stated differently, whether the record shows that "more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (People v. Johnson (2003) 30 Cal.4th 1302, 1318, 1 Cal.Rptr.3d 1, 71 P.3d 270.) Subsequently the United States Supreme Court rejected this standard as too stringent, holding that a prima facie case is established if a reasonable inference of discrimination may be drawn from the record. (Johnson v. California, supra, 545 U.S. at p. 168.)

"[W]e apply a deferential standard of review to the trial court's denial of a defendant's Wheeler/Batson motion, considering only whether the ruling is supported by substantial evidence." (People v. Salcido (2008) 44 Cal.4th 93, 136, 79 Cal.Rptr.3d 54, 186 P.3d 437.) In Salcido, the court recognized that "[a]fter the high court concluded in Johnson that the state constitutional standard employed in Wheeler to determine whether a defendant has made a prima facie case of group discrimination was more rigorous than, and therefore violated, the federal constitutional standard enunciated in Batson [citations], we recognized that a different standard of appellate review is required in cases predating Johnson in which the trial court determined the defendant failed to make a prima facie case of group discrimination." (Id. at p. 137.) Contrary to [petitioner's] argument, application of the pre-Johnson standard does not require automatic reversal of the judgment. Rather, if the wrong standard is applied, or "when it is unclear exactly what standard the trial court has employed in deciding whether the defendant has made a prima facie case, we may not accord deference to the trial court's finding that no prima facie case has been made, but must be satisfied from our independent review of the record that the defendant has made an insufficient showing at the outset to permit an inference of discrimination." (Ibid.) In the present case, however, it is clear from the record that the trial court appreciated the split in authority between the state and federal courts, emphasizing that [petitioner] had failed to make a prima facie showing under either standard. Accordingly, the trial court's finding is entitled to due deference and will be reviewed for substantial evidence.

. . . .

[Petitioner] suggests that "a prima facie case is patently clear" based on the "numbers alone." Excluding hardships, 123 potential jurors and alternates were interviewed on voir dire. Of these, 12 were identified as African-American, six of whom were men. [footnote omitted]. The prosecutor used six of his 37 peremptory challenges to excuse African-American jurors, four against African-American men and two against African-American women. With challenges remaining, two African-American women were seated as jurors, and two African-American women and one African-American man were chosen as alternates. [Petitioner] argues that the number of African-American men struck by the prosecutor indicates a prima facie case of discrimination. We disagree.

. . . .

Although the sample size is slightly larger in this case and the [petitioner] is a member of the excluded group, the record nonetheless supports the trial court's finding that there was no prima facie showing. As the trial court noted, the prosecutor engaged the potential jurors in appropriate voir dire. The answers given by the three African-American men

whose excusals were challenged by [petitioner] expressed opinions regarding police officers, cross-racial identification and drug use that distinguished them from the group as a whole.  The court noted that the first African-America man excused "affirmatively bought into the concept of cro ss-racial identification difficulties."  The second had been arrested on suspicion of committing a robbery and, although he was released shortly after a line-up, he believed he had been treated unfairly.  No motion was made following the third man's removal and the fourth acknowledged a history of drug use and had a relative that was recently killed by a drunk driver.  The court noted its concerns regarding the final man in connection with the potential issues in the case involving drug use and the impact of drunk driving on causation.  Moreover, at the conclusion of jury selection, with challenges remaining, two African-American women were seated as jurors, and one African-American man and two African-American woman were seated as alternates.

Although finding that no prima facie showing had been made, the court did permit the prosecutor to state his reasons for the challenges.  These explanations were all race-neutral and consistent with the court's reasons for deeming there to be no basis for inferring improper discrimination.  FN4.  As the California Supreme Court pointed out in Bonilla, "even when the trial court may ultimately conclude no prima facie case has been made out," these explanations "may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established."  (People v. Bonilla, supra, 41 Cal.4th at p. 343, fn. 13, 60 Cal.Rptr.3d 209, 160 P.3d 84.)  Here, the trial court found no reason to question the prosecutor's explanations, nor do we.  Thus, we find no reason to disturb the trial court's determination that no prima facie case of discrimination was made out.  [footnote omitted]

> FN4.  At oral argument, [petitioner] stressed his contention that the prosecutor gave facially discriminatory explanations involving one African-American man's religion and another's disability.  The prosecutor indicated that the first African-American man was excused because, in addition to his concerns about cross-racial identification, he wore a cross and appeared to be devoutly religious.  The final African-American man was excused because, in addition to having a history of drug use, he had AIDS and the prosecutor was concerned with his ability to pay attention to the proceedings.  These explanations do not necessarily suggest that the challenges to these two prospective jurors were based on impermissible grounds of discrimination.  The prosecutor did not indicate an unwillingness to accept any person of a particular religion or suffering from AIDS, but a concern for how the one individual's strong beliefs would affect his evaluation of the evidence and how the other's disease would affect his ability to concentrate on the proceedings.  Moreover, the potential juror's religion or disability was not the sole reason for the exercise of the peremptory challenges, and it does not appear that they were even substantial factors in the prosecutor's exercise of the challenges.  [citations omitted]  Moreover, the prosecutor's additional explanations do not compel the conclusion, as defendant suggests, that the other legitimate explanations given by the prosecutor for excusing these potential jurors were a pretext for racial discrimination.

Brown, 2009 WL 2172811 at *4-7.

*United States District Court*
*Northern District of California*

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.       Analysis

The use of peremptory challenges by either the prosecution or defendant to exclude cognizable groups from a jury may violate the Equal Protection Clause.  See Georgia v. McCollum, 505 U.S. 42, 55-56 (1992).  The Supreme Court has held that the Equal Protection Clause forbids the challenging of potential jurors solely on account of their race.  See Batson v. Kentucky, 476 U.S. 79, 89 (1986).[5]  Batson permits prompt rulings on objections to peremptory challenges under a three-step process:

First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  Batson, 476 U.S. at 93-94.

Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Id. at 97; Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  Batson, 476 U.S. at 98; Wade, 202 F.3d at 1195.  To fulfill its duty, "the court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts', using all the available tools including its own observations and the assistance of counsel."  Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (citation omitted); Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003).  "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis . . .," particularly when the state court declined to do so.  Jamerson v. Runnels, 713 F.3d 1218, 1224 (9th Cir. 2013).  Then the court should "reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine."  Id. at 1225.

In evaluating the race neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

---

[5]  The California counterpart to Batson is People v. Wheeler, 22 Cal. 3d 258 (1978).

United States District Court
Northern District of California

1    See Hernandez v. New York, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino

2    jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish

3    language testimony).  It should also keep in mind that a finding of discriminatory intent turns

4    largely on the trial court's evaluation of the prosecutor's credibility.  See Rice v. Collins, 546 U.S.

5    333, 340-41 (2006); Lewis, 321 F.3d at 830.  Because determinations of credibility and demeanor

6    of the prosecutor and jurors lie "peculiarly within [the] trial judge's province," the trial court's

7    ruling on the issue of discriminatory intent is entitled to great deference and must be sustained

8    unless clearly erroneous.  Snyder v. Louisiana, 552 U.S. 472, 476-82 (2008) (quoting Wainwright

9    v. Witt, 469 U.S. 412, 428 (1985)); see Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011) (per

10   curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-

11   neutral explanation  for peremptory strikes were insufficient to outweigh evidence of purposeful

12   discrimination).[6]

13           During voir dire, petitioner raised Batson motions to the following five African-American

14   jurors: Jacobs, Scott, Stevens, Woodbury and Kendrick.  While the trial court did not find that

15   petitioner had made out a prima facie case, the prosecution still provided race-neutral reasons for

16   dismissing these jurors.  While the state courts did not conduct a comparative juror analysis, this

17   court will conduct one.  Based on that analysis, it is clear that there was no constitutional

18   violation, and there were proper, race-neutral reasons for challenging these jurors.

19                    **(1)    Mr. Jacobs**

20           When questioned about the reasonable doubt standard, Mr. Jacobs responded that he would

21   only find the defendants guilty if he was absolutely sure.  (Voir Dire Transcript ("VDT"), Vol. 1 at

22   205.)  While he later stated that he would follow the judge's instructions, the prosecutor had a race

23   neutral reason to dismiss him.  While Mr. Jacobs said he felt police he had seen in San Francisco

24

25

26   [6] As the state courts used the appropriate standards (Reporter's Transcript ("RT") at 247, 250.), the
     Court of Appeal opinion is entitled to AEDPA deference.  See Boyd v. Newland, 467 F.3d 1139,
27   1144 (9th Cir. 2006).  Regardless, even if the state courts erred in finding no prima facie case, as
     described below there was no purposeful discrimination after reviewing the prosecutor's reasons,
28   the voir dire record and a comparison to the other jurors.

were professional, he did allude to an incident with Los Angeles police a long time in the past that had clearly affected him.  (VDT, Vol. 1 at 202-03.)

The prosecutor also noted that Mr. Jacobs had AIDS and the prosecutor was concerned that it could be problematic during a long trial with respect to his ability to concentrate and focus on the evidence.  Both the prosecutor and trial judge noted that after several days of being in the courtroom for voir dire and sitting in the jury box, Mr. Jacobs went to a different part of the court and sat where no juror was seated.  (RT at 269.)  The prosecutor felt this demonstrated inattention or inability to follow simple routines.  (Id.)  The trial court stated, "The first thing I noticed about him, that he took the wrong seat, which indicated he's not paying attention or he doesn't understand what's going on in the courtroom.  I was really sort of startled when he did that."  (RT at 271.)  While petitioner also argues that Mr. Jacobs was improperly dismissed due to his disability, juror 927172 had a disability and was seated on the jury.  (VDT, Vol. 2 at 359; Ex. 7 at 50.)  Petitioner has failed to demonstrate a Batson violation as to this juror.

### (2)   Ms. Scott

Ms. Scott stated that it was "particularly" possible that police officers would lie, because they had the authority to express their opinions regarding other people, and they abused that authority.  (VDT, Vol. 5 at 51-52.)  When asked if she was chosen as a juror if she could sit fairly and impartially in hearing the evidence, Ms. Scott stated that she did not think so.  (Id. at 53-54.)

While other seated jurors stated that police as with most people may lie on occasion, none of these jurors stated that police officers were more likely to lie as Ms. Scott did.  For example, juror 906127 stated that he did not think police officers were more or less credible than others and that it was possible for police officers to lie.  (VDT, Vol. 2 at 337.)

Petitioner argued to the state court that another juror stated she might not be able to pay attention to testimony which may not be fair to defendants, yet she was seated as a juror.  (Ex. 7 at 44.)  Petitioner argues that this was similar to Ms. Scott stating she was unsure if she could be fair and impartial and demonstrates the prosecutor's efforts to exclude African-Americans from the jury.  However this juror who was seated, 677072, was also an African-American women like Ms.

12

Scott.  (VDT at 344, RT at 257, 279.)  Petitioner has failed to demonstrate a <u>Batson</u> violation as to this juror.

### (3)    Ms. Stevens

Prior to the attorneys questioning Ms. Stevens and when the prospective jurors were not present, petitioner's trial counsel noted, "Ms. Stevens has a notebook filled with stuff.  She has a huge list -- I don't know that's was her word, but something to that effect -- of concerns she has." (VDT, Vol. 5 at 100.)  When questioned regarding her religious beliefs and if they would interfere with her ability to listen to evidence and then make a judgment on the facts, Ms. Stevens responded, "I would like to think not, but I must say, I believe in God and I believe in following his lead, and so therefore, if I had conflicting instructions, I know where I have to go, okay." (VDT, Vol. 5 at 108.)  When queried about being a fair minded juror Ms. Stevens stated, "I tend to be fair minded.  And I don't know about partiality part because if I feel that the law is impartial, I would have a hard time following that law in terms of making a decision.  If I thought the law was wrong or inequitable, or if I thought that there were problems in terms of how justice is dispensed, in other words, I would have some serious problems."  (<u>Id</u>. at 93.)  She also had strong feelings regarding the San Francisco Police Department's treatment of African-Americans.  (<u>Id</u>. at 109-110.)

Petitioner argues that the prosecutor struck Ms. Stevens solely due to her race and religion, noting that other non-African-American jurors who attended church were not dismissed, such as juror 1067388.  While juror 1067388 may have attended church (VDT, Vol. 4 at 805), that juror did not state that religious beliefs would interfere with the ability to follow the law or jury instructions.  Nor did any other seated jurors state that they would have difficulty following the law and remaining impartial.  There is a compelling interest in having jurors able to follow the law and apply the facts in an impartial way.  A juror who cannot be impartial, even if for religious reasons, may be dismissed for cause.  <u>See</u>, <u>e.g.</u>, <u>United States v. Mitchell</u>, 502 F.3d 931, 954 (9th Cir. 2007) (dismissing for cause jurors whose traditional Navajo religious views against the death penalty would prevent or substantially impair the performance of their duties as jurors did not violate Religious Freedom Restoration Act).  Regardless, petitioner's claim fails because the

United States District Court
Northern District of California

13

Supreme Court has not extended the protections articulated in <u>Batson</u> to religious affiliation or belief.  <u>See</u>, <u>e.g.</u>, <u>Davis v. Minnesota</u>, 511 U.S. 1115 (1994) (denying certiorari to review state supreme court decision declining to extend <u>Batson</u> to religion).  This Court cannot say that the trial court clearly erred in finding that a lack of discriminatory intent as to this juror.

**(4)      Mr. Woodbury**

Mr. Woodbury discussed two different negative experiences with police that he attributed to racial profiling when he was much younger.[7]  He was having lunch when a robbery occurred nearby, and as he left the area he was arrested at gun point and taken to the robbery victim who stated he was not the robber and then released.  (VDT, Vol. 4 at 599-600.)  Years later, Mr. Woodbury was painting a building at a Naval base when a robbery occurred, and he was again arrested at gun point.  (<u>Id</u>. at 600.)  When asked if he could be impartial to the police in the current case, Mr. Woodbury responded that his past experiences would be on his mind and would affect him as a juror.  (<u>Id</u>. at 581, 600.)  He also believed that the San Francisco Police in some instances are not professional.  (<u>Id</u>. at 581.)  There were no other jurors who were similarly situated to Mr. Woodbury with respect to being improperly arrested by police and also sharing his views.  While other jurors did say that police officers can lie, they had not been twice held at gunpoint by police.  Moreover, it is permissible and race neutral to challenge a juror based on his opinions of the criminal justice system, even where the opinion is that the system is racist.  <u>United States v. Steele</u>, 298 F.3d 906, 913-14 (9th Cir. 2002).  Petitioner has failed to demonstrate a <u>Batson</u> violation as to this juror.

**(5)      Mr. Kendrick**

Mr. Kendrick was in Narcotics Anonymous and had problems with narcotics three years prior to voir dire.  (VDT, Vol. 3 at 714-15.)  One month prior, his cousin, whom he had helped to raise, was killed by a drunk driver and legal proceedings had been commenced.  (<u>Id</u>. at 716.)  The cousin had been walking when struck, similar to this case where the victim was struck and killed by a drunk driver.  However, in this case the drunk driver who struck the victim was not the

---

[7] Nearly every potential juror was questioned at great length regarding racial profiling and cross-racial identifications due to the facts of the case.

14

subject of the current prosecution, and the issue of causation with respect to the defendants was clearly an issue.  The prosecutor exercised a challenge based in part on these issues.  Petitioner notes that juror 1074894 knew about drugs from moving to San Francisco in the 1960's yet was not dismissed.  (VDT, Vol. 4 at 800.)  Being exposed to drugs in San Francisco in the 1960's is not similar to having an addition to narcotics within the past three years.  Petitioner also fails to note that juror 1074894 is also African-American.  (VDT, Vol. 4 at 783.)  Petitioner also noted that another seated juror was the victim of a serious crime, but not excused.  While juror 841546 was pickpocketed in 1993 (VDT, Vol. 3 at 592) which led to identity theft, that is not similar to Mr. Kendrick's cousin who was killed by a drunk driver one month prior to voir dire.  Assuming petitioner had made out a prima facie case as to this juror there is no evidence of purposeful discrimination.

     As discussed above, petitioner has failed to show purposeful discrimination by the prosecutor.  Even assuming that the trial and appellate court erred in not finding a prima facie case of discrimination, a comparative juror analysis shows that there were sufficient race neutral reasons for dismissing the jurors.  While not dispositive, the number of African-American jurors on the jury also demonstrates a lack of discriminatory intent by the prosecutor.  Excluding hardships, 123 potential jurors and alternates were interviewed on voir dire.  Twelve were identified as African-American, six men and six women.  The prosecutor used six of his 37 peremptory challenges to dismiss African-Americans, four men and two women.  Even though the prosecutor had challenges remaining, two African-American women were seated as jurors and two African-American women and one African-American man were seated as alternates.[8]  Nearly half the African-Americans were accepted into the jury, and African-Americans constituted a higher percentage of sitting jurors than they did of the venire (at least after the exercise of hardships).  For all these reasons, petitioner has failed to demonstrate that there was a constitutional violation warranting habeas relief.

_____

[8] Respondent notes that reviewing these numbers, a greater percentage of African-Americans were on the jury or the jury including alternates, than were present for voir dire.

2.      **Right to Remain Silent**

Petitioner argues that the use of evidence at trial of his decision not to speak with the police prior to his arrest violated his rights to remain silent, to counsel and to due process. (Amended Petition at 4.)

a.      **Background**

The Court of Appeal discussed the background of this claim:

> At the start of the trial the prosecutor indicated he intended to argue as evidence of [petitioner's] guilt that prior to his arrest, [petitioner] agreed to meet with the police to make a statement but never did so.  [Petitioner] objected to the proposed comments on the ground that any comment by the prosecutor on his decision not to speak to the police would violate due process and his Fifth Amendment right to remain silent.  His attorney explained that [petitioner] decided not to make a statement to the police after consulting with his attorney and that this information was relayed to the police the day after the scheduled interview.  The trial court overruled the objection, finding that [petitioner] was not in custody at the time and that there was insufficient evidence that [petitioner's] decision not to make a statement was the assertion of any constitutional right.
>
> Consistent with the pretrial ruling, the prosecutor mentioned in his opening statement that [petitioner's] failure to make a statement to the police was evidence of his guilt.  Inspector Camilleri testified he told [petitioner] that he needed to speak with him in person and that [petitioner] agreed to call him later that day to make an appointment.  Breed called later that day, however, and said that [petitioner]would not be coming to the station.  On cross-examination, [petitioner's] attorney elicited testimony from Camilleri confirming that he had spoken with [petitioner's] attorney the next day and that counsel indicated that he needed to speak with [petitioner] before deciding whether [petitioner] would make a statement to the police.  Breed confirmed that even though she agreed to bring [petitioner] to the police station to make a statement, she did not do so and instead they "went to get an attorney."  In closing argument, the prosecutor again relied on [petitioner's] failure to make a statement by arguing that Breed "was going to help [petitioner] ... come in, perhaps, and turn himself in or see the cops that evening, because the cops, ladies and gentlemen, they wanted to talk, didn't they?  They want to meet him.  They want to get a statement, they want to do their job which is investigate these things.  [¶]  Very polite.  And notwithstanding this apparent willingness to come in, he never showed up."

Brown, 2009 WL 2172811 at *7.

The Court of Appeal then described in detail the relevant law regarding pre-arrest silence offered as substantive evidence, noting the lack of Supreme Court authority and split in the federal circuits and held that the introduction of the evidence of petitioner's refusal to make a statement violated his right to remain silent.  The Court of Appeal then found that the use of this evidence was harmless, stating:

16

Under <u>Chapman v. California</u> (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L.Ed.2d 705, a violation of a criminal defendant's federal constitutional rights requires reversal of the judgment unless the reviewing court determines "beyond a reasonable doubt that the error complained of did not contribute to the verdict."  An error may be harmless beyond a reasonable doubt where "[t]he evidence of defendant's guilt [is] overwhelming."  (<u>People v. Riggs</u> (2008) 44 Cal.4th 248, 317, 79 Cal.Rptr.3d 648, 187 P.3d 363.)

Here, [petitioner] not only refused to speak with the police, but he attempted to evade arrest, which was properly shown by evidence independent of his silence, demonstrating far more persuasively his consciousness of guilt.  This evidence coupled with two eyewitness identifications of [petitioner] as one of the robbers, his DNA on the bandana found at the site of the robbery, and White's dying declaration that S.B. pushed her out of the car overwhelmingly establish [petitioner's] involvement in the robbery and the carjacking.  The admission of the additional evidence that [petitioner] chose not to make a statement to the police on advice of counsel was therefore harmless beyond a reasonable doubt.

<u>Brown</u>, 2009 WL 2172811 at *10 (footnote omitted).

### b.    Analysis

Due process requires that a defendant be able to exercise his "constitutional right to remain silent and not be penalized at trial for doing so."  <u>United States v. Negrete-Gonzales</u>, 966 F.2d 1277, 1280-81 (9th Cir. 1992).  The government may not use a defendant's silence "at the time of arrest and after receiving <u>Miranda</u> warnings" to impeach the defendant's exculpatory testimony at trial.  <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976).  When <u>Doyle</u> has been violated, a petitioner is not entitled to habeas relief "unless the error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Hurd v. Terhune</u>, 619 F.3d 1080, 1089–90 (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 622, 637–38 (1993)).  In evaluating whether <u>Doyle</u> error was harmless, the habeas court "attempts to determine not whether the jury would have decided the same way even in the absence of the error, but whether the error influenced the jury."  <u>Hurd</u>, 619 F.3d at 1090 (internal quotation marks omitted).  In doing so, the court considers "(1) the extent of the comments, (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting the defendant's guilt."  <u>Id</u>. (alterations omitted).  A federal habeas court applies the harmless-error standard enumerated in <u>Brecht</u> "without regard for the state court's harmlessness determination."  <u>Merolillo v. Yates</u>, 663 F.3d 444, 455 (9th Cir. 2011).

As a preliminary matter, it is not clear that Petitioner even makes out a claim for <u>Doyle</u>

17

United States District Court
Northern District of California

1   error.  The Supreme Court has not decided the issue of whether a prosecutor may comment on a

2   defendant's pre-arrest silence as substantive evidence of guilt.  See Jenkins v. Anderson, 447 U.S.

3   231, 236 n. 2 (1980) ("Our decision today does not consider whether or under what circumstances

4   prearrest silence may be protected by the Fifth Amendment.").  And the Ninth Circuit has

5   affirmatively permitted such evidence.  United States v. Beckman, 298 F.3d 788, 795 (9th Cir.

6   2002) ("The use of a defendant's pre-arrest, pre-Miranda silence is permissible as impeachment

7   evidence and as evidence of substantive guilt.").

8       Even assuming that the facts give rise to a Doyle claim, however, petitioner has failed to

9   demonstrate that the introduction of the evidence had a substantial and injurious effect on the

10  jury's verdict.  See Fry v. Pliler, 551 U.S. 112, 121–22 (2007) (federal habeas courts must assess

11  the prejudicial impact of a state court's constitutional error under Brecht, whether or not the state

12  appellate court recognized the error and reviewed it for harmlessness under Chapman.)  As noted

13  by the state court, there were eyewitness identifications of petitioner as one of the robbers, his

14  DNA was found on a bandana found at the robbery location and there was the dying declaration

15  from the victim.[9]  In light of the other evidence connecting petitioner to the robbery and

16  carjacking, any error in admitting the evidence of his pre-arrest silence was harmless.  While

17  petitioner's pre-arrest silence was presented to the jury in opening and closing arguments and

18  through one of the police officer witnesses, the Court cannot conclude that it did not have a

19  substantial and injurious effect on the jury's verdict.

20      Petitioner's claim for relief based on the use of his pre-arrest silence is denied.

21

22          **3.        Exclusion of Civil Suit Evidence**

23

24

25

26  [9] In the traverse petitioner repeatedly argues that the evidence was not overwhelming and there
    were problems with the identification and DNA evidence.  Petitioner has not presented (or
27  exhausted) ta claim regarding sufficiency of the evidence.  To the extent petitioner argues he was
    the robber wearing the bandana and not the robber with the gun, such that some of the gun
28  enhancements should be reversed, he has also not presented or exhausted such a claim.

18

Petitioner maintains that his rights to confrontation and to present a defense were violated when the trial court excluded evidence that Police Officer Watts was a defendant in a civil suit related to White's death on the bridge.  (Amended Petition at 4.)

**a.      Background**

The Court of Appeal considered and rejected this claim as follows:

Prior to trial, the prosecutor moved to preclude any reference to the wrongful death action filed by White's mother against Officer Watts and the city, which alleged that White's death was caused by Watts's negligence.  The court granted the motion under Evidence Code section 352, but indicated that the evidence might be admissible to impeach the mother should she testify.  The court offered to reconsider its ruling if [petitioner] showed that the lawsuit alleged punitive damages against Watts for which he would be personally liable.  No such evidence was presented.  In cross-examining Watts, the defense therefore was precluded from questioning him about the mother's wrongful death action.  [Petitioner] contends that the court's ruling violated his Sixth Amendment right to confront the witnesses against him.

. . . .

Officer Watts was cross-examined extensively regarding the reasonableness of his conduct on the bridge.  Defense counsel questioned him concerning several inconsistencies and omissions between his trial testimony and his initial statements about the crime.  The defense brought out that Watts had been with the San Francisco Police Department for only seven months and was still on probation at the time of the crime.  In closing argument, counsel argued that Watts made critical errors on the bridge.  He argued that when the passenger got out of the car and was ordered to the ground by Watts, White, hearing Watts's commands, remained on the ground, causing her to be in the path of oncoming traffic.  The prosecutor argued, "He was under a lot of stress.  No one's blaming him for doing something evil or wrong or anything of that nature.  Well, perhaps wrong, negligent, but he's not a criminal.  I mean, he did the best he could under the circumstances."  We do not believe the trial court abused its discretion in precluding cross-examination concerning the civil action, given its marginal relevance and potential for distraction.  Even if the line of questioning should have been permitted, it is highly unlikely that the jury would have received a different impression of Watts had they known that White's mother had filed a wrongful death action against him.  Accordingly, the court did not err in excluding this evidence.

Brown, 2009 WL 2172811 at *10-11.

**b.      Analysis**

The constitutional right to present a complete defense includes the right to present evidence, including the testimony of witnesses.  See Washington v. Texas, 388 U.S. 14, 19 (1967).  But the right is only implicated when the evidence the defendant seeks to admit is "relevant and

*United States District Court*
*Northern District of California*

19

material, and . . . vital to the defense." Id. at 16.  Additionally, a violation of the right to present a defense does not occur any time such evidence is excluded, but rather only when its exclusion is "arbitrary or disproportionate to the purposes [the exclusionary rule applied is] designed to serve." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (internal citation and quotation marks omitted).  "Only rarely" has the Supreme Court held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.  Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (citing Holmes, 547 U.S. at 331 (rule did not rationally serve any discernible purpose).

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.  Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

Generally speaking, a court violates the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic.  Fenenbock v. Director of Corrections, 692 F.3d 910, 919 (9th Cir. 2012).  A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility . . . had counsel been permitted to pursue his proposed line of cross-examination."  Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).  A limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witnesses.  United States v. Urena, 659 F. 3d 903, 907-908 (9th Cir. 2011).

The relevance of the civil suit to Watts' testimony involved the events on the bridge that led to White's death.  The trial court granted a new trial for the murder count, and this habeas action only involves the robbery and carjacking counts.  The civil suit had little relevance to those

United States District Court
Northern District of California

20

counts.  Regardless, petitioner has still failed to demonstrate an error of constitutional magnitude with respect to his ability to present a defense or effectively confront this witness.

Watts was cross-examined in great detail regarding the events on the bridge and his actions thereon.  It was established that he was on probation with the police department.  Trial counsel was able to argue in closing that Watts made critical errors, was under a lot of stress and was negligent.  (RT at 5135.)  The jury was presented a great deal of evidence regarding Watts and the events on the bridge to make a determination regarding his credibility.  Petitioner has failed to articulate how the pending civil suit was relevant to the defense, or how the jury's view of Watt's credibility might have changed had this additional fact been known.  The Court concludes that the state court opinion was not an unreasonable application of Supreme Court authority.  Accordingly, petitioner is not entitled to habeas relief on this claim

### 4.  Dying Declaration

Petitioner argues that White's dying declaration on the bridge violated his right to confrontation because it was inadmissible testimonial hearsay, was made by a co-participant and was unreliable due to White being injured and under the influence of drugs.  (Amended Petition at 4-5.)

#### a.  Background

The Court of Appeal set forth the relevant background:

> . . . . [A]s White lay bleeding on the bridge, in response to Officer Aschero's questions she stated that "S.B." threw her out of the car.  While Aschero asked White questions, Officer Pasquinzo took notes of the conversation.  Those notes were lost or destroyed prior to trial. [Petitioner] moved in limine to exclude White's statements on many grounds, all of which were rejected.  On appeal, petitioner contends the admission of White's statements violated his constitutional rights to confrontation and due process.

Brown, 2009 WL 2172811 at *12.

#### b.  Analysis

##### (1)  Crawford v. Washington

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a

United States District Court
Northern District of California

procedural rather than a substantive guarantee.  <u>Crawford v. Washington</u>, 541 U.S. 36, 61 (2004).

It commands, not that evidence be reliable, but that reliability be assessed in a particular manner:

by testing in the crucible of cross-examination.  <u>Id</u>.  The Clause thus reflects a judgment, not only

about the desirability of reliable evidence, but about how reliability can best be determined.

<u>Crawford</u>, 541 U.S. at 61.

The Confrontation Clause applies to all "testimonial" statements.  <u>See</u> <u>Crawford</u>, 541 U.S.

at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of

establishing or proving some fact."  <u>Id</u>. at 51 (internal quotation and citation omitted); <u>see id</u>. ("An

accuser who makes a formal statement to government officers bears testimony in a sense that a

person who makes a casual remark to an acquaintance does not.").  The Confrontation Clause

applies not only to in-court testimony but also to out-of-court statements introduced at trial,

regardless of the admissibility of the statements under state laws of evidence.  <u>Crawford</u>, 541 U.S.

at 50-51.

Petitioner first argues that the dying declaration was improperly admitted as a testimonial

statement.  In the state opinion, the California Court of Appeal discussed the relevant caselaw

describing the difference between testimonial and non-testimonial statements.  The court noted it

was a close question in this case, but held it did not need to be decided as the statement was

properly admitted under state law as a dying declaration.  For the same reasons, this Court need

not determine if the statement was testimonial or non-testimonial.

The Supreme Court noted in <u>Crawford</u> that one exception to the admission of hearsay

statements in criminal cases at common law was the exception for testimonial dying declarations.

<u>See id</u>. at 56 n. 6 ("Although many dying declarations may not be testimonial, there is authority

for admitting even those that clearly are.").  The Supreme Court chose not to decide the question,

stating, "[w]e need not decide in this case whether the Sixth Amendment incorporates an

exception for testimonial dying declarations.  If this exception must be accepted on historical

grounds, it is sui generis."  <u>Id</u>.  <u>See also</u> <u>Michigan v. Bryant</u>, 131 S.Ct. 1143, 1151 n. 1 (2011).  As

there is no established authority, the state court opinion cannot an unreasonable application of

Supreme Court law.

1   Even assuming there was an error in admitting the dying declaration, Confrontation Clause

2   claims are subject to harmless error analysis.  United States v. Nielsen, 371 F.3d 574, 581 (9th Cir.

3   2004) (post-Crawford case).  Petitioner has failed to show that the admission of the statement had

4   an actual and prejudical effect upon the jury.  While the statement implicated petitioner in pushing

5   White out of the car, a new trial was granted on the murder charge, and there was still eyewitness

6   and DNA evidence placing petitioner at the scene of the robbery.  The admission of this statement,

7   if it was an error, was harmless.  This claim is dismissed.

8                              **(2)        Co-Participant Statement**

9         A defendant is deprived of his Sixth Amendment right of confrontation when a facially

10  incriminating confession of a non-testifying codefendant is introduced at their joint trial, even if

11  the jury is instructed to consider the confession only against the codefendant.  See Bruton v.

12  United States, 391 U.S. 123, 126, 135-36 (1968).  While the Confrontation Clause does not

13  necessarily bar the admission of hearsay statements, it may prohibit introducing evidence that

14  otherwise would be admissible under a hearsay exception.  See Idaho v. Wright, 497 U.S. 805,

15  813, 814 (1990); see, e.g., Lilly v. Virginia, 527 U.S. 116, 139-40 (1999) (plurality) (admission of

16  accomplice's hearsay confession to police inculpating defendant violated Confrontation Clause);

17  id. at 143 (Scalia, J., concurring) (same).

18        Petitioner next claims that White's statement was improperly admitted, arguing that White

19  was a co-participant and her statement implicated petitioner for the crimes in violation of the

20  Bruton line of cases.  The state court denied the claim:

21        [Petitioner] argues that even assuming the evidence was not inadmissible under Crawford,
          it was error not to exclude the statements under Bruton v. United States (1968) 391 U.S.
22        123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (Bruton).  In Bruton, the court held that the admission
          of a statement of an accomplice or co-participant that implicates a defendant violates the
23        defendant's Sixth Amendment rights when the defendant has no opportunity to cross-
          examine the co-participant.  (Id. at pp. 127-128; see also Lee v. Illinois (1986) 476 U.S.
24        530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 [there is a "basic understanding that when one
          person accuses another of a crime under circumstances in which the declarant stands to
25        gain by inculpating another, the accusation is presumptively suspect and must be subjected
          to the scrutiny of cross-examination"].)  This is so even when the accomplice is not tried
26        with the defendant.  (Douglas v. Alabama (1965) 380 U.S. 415, 418-420, 85 S.Ct. 1074, 13
          L.Ed.2d 934.)  Bruton, however, "does not stand for the proposition that all statements of
27        one defendant that implicate another may not be introduced against all defendants in a joint

28                                                 23

trial.  The Bruton opinion itself stated that the offending hearsay statement in that case was clearly inadmissible against the nondeclarant under traditional rules of evidence, and that there was no recognized exception to the hearsay rule for its admission."  (People v. Greenberger, supra, 58 Cal.App.4th at p. 332, 68 Cal.Rptr.2d 61.)  In contrast, where the evidence is admissible pursuant to a recognized hearsay exception and does not otherwise offend the Sixth Amendment's confrontation clause, Bruton does not require exclusion.  (Id. at pp. 332, 334; People v. Cervantes (2004) 118 Cal.App.4th 162, 176-177, 12 Cal.Rptr.3d 774.)  As discussed above, White's statements qualify as dying declarations and thus were admissible against [petitioner] regardless of whether she was his accomplice in the robbery.

Brown, 2009 WL 2172811 at *14.

To implicate the Bruton cases, there must have been a violation of the Confrontation Clause, which petitioner has failed to establish.   For the same reasons there was no violation under Crawford, there was no violation under Bruton as the dying declaration may be admitted regardless if it was testimonial.   See Whorton v. Bockting, 549 U.S. 406, 419–20 (2007) (the Confrontation Clause has no application to nontestimonial statements and therefore permits their admission even if they lack indicia of reliability).   A harmless error analysis would still apply if there was a violation, and any error was harmless as set forth above.[10]

### (3)    Reliability of Statement

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment.  Blackburn v. Alabama, 361 U.S. 199, 207 (1960).  The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect.  Miller v. Fenton, 474 U.S. 104, 116 (1985).  Absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment.  Colorado v. Connelly, 479 U.S. 157, 167 (1986).

---

[10] Petitioner alleges that White was a co-participant, but fails to provide evidence to support this argument.  While it is not impossible that White participated in the robbery, she was by all accounts the victim of the carjacking and murder.  Thus, hers was not a statement from a co-participant.  Moreover, Bruton and the other cases petitioner cites do not categorically restrict all statements from a co-participant.  Bruton does not expand protections of the Confrontation Clause, instead it rejected attempts to cure an error with limiting instructions.  Under state law the dying declaration was properly admitted and there is no Supreme Court authority preventing such an admission, as described above.

24

United States District Court
Northern District of California

1    Courts have also inquired into whether the defendant was intoxicated when providing a

2    statement.  See e.g., Beecher v. Alabama, 408 U.S. 234, 236–37 (1972) (confession was

3    involuntary when made just after the defendant underwent two injections of morphine to treat his

4    gunshot wound); see also United States v. Guaydacan, 470 F.2d 1173, 1173–74 (9th Cir. 1992)

5    (per curiam) (listing as a factor whether the defendant was under the influence of drugs); but see

6    United States v. George, 987 F.2d 1428 (9th Cir. 1993) (statement voluntary while defendant in

7    hospital and suffering from possible drug overdose at time of interrogation); United States v.

8    Lewis, 833 F.2d 1380, 1387–88 (9th Cir. 1987) (statement was voluntary although the defendant

9    suffered from heroin addiction and anesthesia at the time she made her confession).

10    Petitioner also argues that the dying declaration was unreliable because White was

11    questioned by police while severely injured and she was under the influence of drugs.  The state

12    court denied the claim:

13    Moving beyond the Sixth Amendment, [petitioner] argues that the due process clause

14    independently required exclusion of White's statements because they were involuntary and
     inherently unreliable.  However, there is absolutely no evidence of police coercion

15    sufficient to render White's statements involuntary.  (See People v. Williams (1997) 16
     Cal.4th 635, 659, 66 Cal.Rptr.2d 573, 941 P.2d 752 ["A confession or admission is

16    involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police
     activity"].)  Likewise, substantial evidence supports the conclusion that despite White's

17    injuries and drug use, she was conscious and lucid at the time she made the statements.
     The admission of her statements did not violate [petitioner's] right to due process.

18

19    Brown, 2009 WL 2172811 at *14.

20    Looking at the factors surrounding White being hit by a car and police then speaking with

21    her, petitioner is not entitled to habeas relief.  To the extent petitioner asserts that police

22    improperly questioned White, any such claim is denied.  Police arrived after she was struck by the

23    car and questioned her about what happened and who was responsible.  There is no merit to

24    petitioner's claim that the statement was involuntary or coerced.  Petitioner's claim that White was

25    under the influence of drugs and therefore the statement was unreliable is also without adequate

26    basis.  While drugs were found in her system, the responding paramedic described White as

27    oriented and aware of what was occurring despite the serious injurious.  Nor could the police have

28    known that White was under the influence of drugs when they questioned her at the scene.

United States District Court
Northern District of California

Petitioner's conlcusory argument with little support is insufficient and he has failed to show that the state court decision denying this claim was an unreasonable application of Supreme Court law.

### 5. Jury Question

Petitioner contends that the trial court improperly answered a question from the jury which resulted in petitioner being denied the right to have the jury decide each element of the carjacking charge.  (Amended Petition at 5.)

### a. Background

During deliberations, the jury sent out a note that stated, "[i]f White exited car on the bridge of own accord, independently of others, are defendants still responsible.  Pg. 51, line 10".  (CT at 1830.)  The citation to a page and line referenced the jury instruction discussing an exonerating independent cause instruction that was given with the murder charge.  <u>Brown</u>, 2009 WL 2172811 at *11; CT at 1817-18; RT at 5349-51.

The Court of Appeal discussed the trial court's response and rejected this claim as follows:

> In response, the [trial]court clarified that it was assuming that the jury was "asking a question based upon the concurrent cause rule and the exonerating cause rule," then re-read the standard instructions already given on causation.  To these instructions, the court added, "If her being struck was due to a cause independent from, disconnected from or did not flow from any robbery or carjacking in progress, . . . such being the conduct of the other occupants of the Ford, neither of the defendants are guilty of homicide.  [¶]  If she got out of the car due to force or fear of those inside the car or because of conduct having to do with any robbery or carjacking in progress, her conduct is not independent of, nor is it disconnected from the robbery or the carjacking in progress.  [¶]  If her getting out of the car and thereafter getting struck flowed from or was connected to such illegal conduct of the occupants, the occupants are not exonerated by any independent cause."

> [Petitioner] claims that these supplemental instructions were prejudicial with regard to his carjacking conviction.  He argues, "The answer to the note was confusing, did not answer the jury's question, steered the jury away from the subject of the question toward a finding of culpability, and did not inform the jury of the clearly exculpatory impact of its proffered scenario in the carjacking charge.  Moreover, both the question from the jury, which showed that at least one juror was leaning toward a finding of facts exculpatory to the [petitioner], and the trial court's problematic answer went to the very heart of the case: was the [petitioner] guilty of carjacking?"  The jury's question and the court's answer, however, was not made in reference to the carjacking charge.  The question referenced the causation instructions relevant to the murder charge and was treated as such by the trial judge, the prosecutor and the defense attorneys.  Contrary to [petitioner's] assertion, at no point did the defense object on the ground that the answer might be misleading as to the carjacking charge.

1

2

3

4

5

In any event, the jury was properly instructed on the necessary elements of carjacking. The jury was instructed that "Every person who takes a motor vehicle in the possession of another from her person ... against her will and with the intent to either permanently or temporarily deprive the person in possession of the vehicle of her possession, accomplished by means of force or fear, is guilty of the crime of carjacking."  The additional instructions given by the court in response to the jury's question did not alter the carjacking instructions.  Nor was it likely to confuse the jury in that regard.

<u>Brown</u>, 2009 WL 2172811 at *11-12.

6

       b.    <u>Analysis</u>

7

8

A challenge to a jury instruction solely as an error under state law does not state a claim

9

cognizable in federal habeas corpus proceedings.  See <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72

10

(1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

11

the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

12

process.  See <u>Id</u>. at 72.  The instruction may not be judged in artificial isolation, but must be

13

considered in the context of the instructions as a whole and the trial record.  <u>Id</u>.  In other words,

14

the court must evaluate jury instructions in the context of the overall charge to the jury as a

15

component of the entire trial process.  <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing

16

<u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977))

17

"When a jury makes explicit its difficulties, a trial judge should clear them away with

18

concrete accuracy."  <u>Bollenbach v. United States</u>, 326 U.S. 607, 612-13 (1946).  The trial judge

19

has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate

20

the jury's confusion.  See <u>Beardslee v. Woodford</u>, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless

21

due process violation occurred when, in responding to request for clarification, court refused to

22

give clarification and informed jury that no clarifying instructions would be given).  However, the

23

trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's

24

response to a question from the jury.  <u>Arizona v. Johnson</u>, 351 F.3d 988, 994 (9th Cir.  2003).

25

Also, just as a jury is presumed to follow its instructions, it is presumed to understand a judge's

26

answer to a question.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).

27

The question from the jury and the answer provided by the trial court involved the murder

28

charge, not the carjacking charge.  While petitioner has attempted to expand the jury question to

involve carjacking, the contention is without support in the record.  (RT at 5338-45.)  Trial

counsel also failed to object to the answer provided by the trial court.  See Henderson, 431 U.S. at

154 ("It is the rare case in which an improper instruction will justify reversal of a criminal

conviction when to objection has been made in the trial court").

Even if the issue is framed as whether the jury was properly allowed to determine the

elements of the carjacking charge, Petitioner has failed to show that the carjacking jury instruction

or the trial court's answer were erroneous at all, let alone so improper as to violate due process.

The jury was provided with the following instruction with respect to the carjacking count:

> Every person who takes a motor vehicle in the possession of another, from her person or
> immediate presence or from the person or immediate presence of a passenger of a motor
> vehicle against her will and with the intent to either permanently or temporarily deprive the
> person in possession of the vehicle of her possession accomplished by means of force or
> fear, is guilty of the crime of carjacking in violation of Penal Code Section 215.

CT at 1800.

The trial court's answer to the jury question set forth above that discussed the reasons why

White exited the car and what would lead to defendants being guilty of homicide.  This instruction

did not misstate the elements of carjacking or otherwise interfere with the jury's ability to find

petitioner guilty of carjacking.  Petitioner has failed to show that the trial or appellate court erred,

let alone any error that was an unreasonable application of federal authority.  This claim is denied.

### 6.    Jury Misconduct

Petitioner claims one juror's comment to other jurors offering her expert opinion as a nurse

who worked with dying patients violated petitioner's rights.  (Amended Petition at 5.)

### a.    Background

The Court of Appeal considered and rejected this claim as follows:

[Petitioner] made a motion for new trial on the ground of juror misconduct.  In support of
his motion he submitted the declaration of juror M.S. stating that juror J.H. told the other
members of the jury that she worked as a nurse and had experience with dying patients and
that "during deliberations all of the jurors asked juror [J.H.] questions regarding whether or
not Lenties White was lucid when she gave what was called, 'her dying declaration.'"
However, juror M.S. could not remember J.H.'s opinion. [Petitioner's] investigator also
submitted a declaration stating that he had spoken with another juror who similarly
reported that juror J.H. told the jury about her experience as a nurse and offered the

opinion that White was most likely lucid at the time she gave her statement to the officer. The trial court denied the new trial motion on this ground.

[Petitioner] contends that "juror J.H. committed reversible misconduct of federal constitutional dimension when she stated her expert opinion in the jury room that White was likely lucid when she made her statement on the bridge." We disagree. """"It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of an issue is misconduct."""" (People v. San Nicolas (2004) 34 Cal.4th 614, 649, 21 Cal.Rptr.3d 612, 101 P.3d 509; see also People v. Steele (2002) 27 Cal.4th 1230, 1266, 120 Cal.Rptr.2d 432, 47 P.3d 225 ["A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations"].)

In San Nicolas, the defendant moved for a new trial on the ground that a juror who was a registered nurse improperly asserted her expertise during deliberations. The defendant submitted declarations from other jurors stating that the juror "disclosed to the jury that she was a nurse, and she explained a number of the medical issues relating to blood pressure and circulation. 'She also explained shunting, and the manner in which the body would have directed the blood after the stab wounds were inflicted. Her explanations were helpful in determining whether the child was dead before she was sexually assaulted.'" (People v. San Nicolas, supra, 34 Cal.4th at p. 648, 21 Cal.Rptr.3d 612, 101 P.3d 509.) The court found that the trial court did not abuse its discretion in ruling that there was no misconduct where "the evidence presented in support of defendant's motion for a new trial [did] not show that Renee P. offered the jurors any basis for deciding the case other than the evidence and testimony presented at trial. No declaration suggests that she made any assertion inconsistent with the properly admitted evidence and testimony. Indeed, the remarks attributed to her in her declaration are consistent with the trial testimony of the pathologist, who expounded at length on the concept of blood flow, circulation, and the meaning of 'shunting.'" (Id. at p. 650, 21 Cal.Rptr.3d 612, 101 P.3d 509.) Likewise, in this case the responding officer and paramedic testified that White was conscious and able to communicate when they spoke to her on the bridge while the defense presented expert testimony suggesting that her ability to communicate and her perception might have been compromised by her injuries and drug use. It was not misconduct for Juror J.H. to rely on her professional experience to evaluate the competing evidence. Nothing in the declarations suggests that "she made any assertion inconsistent with the properly admitted evidence and testimony." (Ibid.)

Brown, 2009 WL 2172811 at *17-18.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

###### b.      Analysis

A juror's past personal experiences may be an appropriate part of the jury's deliberations. Grotemeyer v. Hickman, 393 F.3d 871, 879 (9th Cir. 2004).  Jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict.  See id. at 878-79 (foreman's reference to and reliance on her medical experience in comments to other jurors did not constitute introduction of extrinsic evidence in violation of 6th Amendment right to confrontation).  However, in some instances a juror's personal experiences may constitute impermissible extrinsic evidence.  See id. at 880; United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991).  This is the case when: (1) a juror has personal knowledge regarding the parties or the issues involved in the litigation that might affect the verdict, or (2) the jury considers a juror's past personal experiences in the absence of any record evidence on a given fact.  See id. at 821-22; see, e.g., Mancuso v. Olivarez, 292 F.3d 939, 951-52 (9th Cir. 2002) (juror's  personal knowledge of facts specific to defendant that were not part of the record constituted impermissible extrinsic evidence).  Personal experiences are relevant only for purposes of interpreting the record evidence.  See Navarro-Garcia, 926 F.2d at 822.

The facts of this case are quite similar to Grotemeyer.  The Ninth Circuit stated, "[t]he mere fact that the jury foreman brought her outside experience [as a medical doctor] to bear on the case [did not] violate [defendants'] constitutional right to confrontation ... That a physician is on the jury does not deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise."  Id. at 879.  Similar to Grotemeyer, the juror in this case was a nurse who said that White was most likely lucid when she made her dying declaration.  That the juror based her statement on her knowledge and experience as a nurse did not violate petitioner's constitutional rights.  The juror did not present her views on a matter for which there was no evidence.  Several witnesses including a paramedic testified that White was conscious and able to communicate after being struck by the car and a defense expert testified that White's ability to communicate could have been compromised.  As in Grotemeyer, the juror here was permitted to use her life

experiences in evaluating the evidence presented at trial.  Petitioner is not entitled to habeas relief on this claim.

### 7.   Jury Instruction

Petitioner argues that trial court's supplemental instruction regarding the gun enhancement created a mandatory presumption of guilt that relieved the prosecution of its burden of proving each element beyond a reasonable doubt.  (Amended Petition at 5.)

### a.   Background

The Court of Appeal considered and rejected this claim as follows:

During deliberations, the jury requested further instruction on the difference between the gun enhancements under sections 12022.5, subdivision (a) (personal use of a firearm), 12022.53(b) (personal use of a firearm during a specified felony), and 12022, subdivision (a)(1) (principal armed with a firearm).  The court clarified the different required findings, but the following morning the jury continued to have questions.  After offering additional clarification on the required findings, the trial judge added, "It appears that you have seen and appreciate the special findings under [sections] 12022.5 and 12022.53 are identical. So I'm instructing you that they are identical factual findings.  [¶]  There is no difference between the facts that must support a finding of one than the facts that must support a finding of the other.  They are identical.  [¶]  The reason that they're separate is they just happen to be lodged in two separate sections of the penal code, but they are identical findings. [¶]  Neither is factually different from the other.  Each requires the same factual proof and the same burden of proof.  Either displaying or firing or striking or hitting.  Any one of those three forms of use as set forth in the instruction is sufficient for a finding of true."  The judge confirmed that if one is true the other is automatically true.  "[I]f you [found] one was true and the other was untrue, I'd bring it to your attention and ask the jury to resolve it.  Are they both true, are they both untrue.  [¶]  They have to be identical."

[Petitioner] contends that the judge's comments "created a mandatory presumption that required the jury to find the enhancements true without individually considering the elements of each.  Thus, the true findings were made in violation of [his] federal constitutional right to have each element decided beyond a reasonable doubt."  [Petitioner] does not dispute that the elements of sections 12022.5, subdivision (a) and 12022.53, subdivision (b) are identical.  Both enhancements apply to the personal use of a firearm and are governed by CALJIC No. 17.19.  The sole difference between the two enhancements is that section 12022.5, subdivision (a) applies to the use of a firearm in the commission of any felony, while section 12022.53, subdivision (b) applies only to the use of a firearm during a felony specified in subdivision (a).  Robbery is such an enumerated felony, so that the court correctly advised the jury that either the allegations were true as to both sections or as to neither.  The court's supplemental instructions did not relieve the jury of its obligation to find that defendant personally used a firearm in the commission of the charged offenses.  (See People v. Strickland (1974) 11 Cal.3d 946, 961, 114 Cal.Rptr. 632, 523 P.2d 672.)  Accordingly, there was no error.

Brown, 2009 WL 2172811 at *18-19 (footnotes omitted).

31

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.     Analysis

The first step in analyzing whether a jury instruction that creates an evidentiary inference violates due process by relieving the State of its burden of proving each element of a crime beyond a reasonable doubt is to determine whether the instruction creates a mandatory presumption or a permissive inference.  See United States v. Warren, 25 F.3d 890, 897 (9th Cir. 1994).  "A mandatory presumption tells the jury that it must presume that an element of a crime has been proven if the government proves certain predicate facts."  Id.  By contrast, "a permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts."  Id.  If a jury "might reasonably have interpreted the permissive language (i.e. 'may') as mandatory," the court should consider the instruction to have created a mandatory presumption.  See Dickey v. Lewis, 859 F.2d 1365, 1369 (9th Cir. 1988).

The Supreme Court's holdings in Carella v. California, 491 U.S. 263 (1989), and Sandstrom v. Montana, 442 U.S. 510 (1979), provide the controlling authority on mandatory presumptions in jury instructions on habeas corpus review.  Powell v .Galaza, 328 F.3d 558, 563 (9th Cir. 2003) (on remand from United States Supreme Court).  An instruction that creates a mandatory presumption violates due process because it "directly foreclose[s] independent jury consideration of whether the facts proved establish[] certain elements of [the charged offense] . . . and relieve[s] the State of its burden of . . . proving by evidence every essential element of [the] crime beyond a reasonable doubt."  Carella, 491 U.S. at 265-66 (citations omitted).  If the inference instruction violated the petitioner's right to due process, the petitioner can only obtain relief if the unconstitutional inference instruction resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993).  See Patterson v. Gomez, 223 F.3d 959, 967-68 (9th Cir. 2000).

The gun enhancement at issue, § 12022.5 provides, "[e]xcept as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."  Section 12022.53(b) is identical.  Petitioner claims that by stating the two sections were identical, the trial court created a

32

mandatory presumption that the jury should find the enhancements true without considering each element. Petitioner also argues that the sections are not identical as § 12022.53(b) relates to a robbery and § 12022.5 relates to any felony.

Petitioner's argument is meritless. While one section is specific to the offense of robbery and the other applies to any felony, there is no dispute that a robbery is a felony. Nor did the trial court's supplemental instruction create a mandatory presumption of any kind. The trial court stated that the sections were identical, but the jury was still required to find each element beyond a reasonable doubt. The jury was provided the proper jury instruction, CALJIC No. 17.19 which states:

> It is alleged [in Count[s]] that the defendant[s] personally used a firearm during the commission of the crime[s] charged. [¶] If you find the defendant[s] guilty of [one or more of] the crime[s] charged [or an attempt to commit the crime[s] charged] [or a lesser and included felony offense], you must determine whether the defendant[s] personally used a firearm in the commission of [that] [those] [felony] [felonies]. [¶] The word 'firearm' includes [a.] [any device designed to be used as a weapon from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion.] [The 'firearm' need not be operable.] [¶] The term 'personally used a firearm,' as used in this instruction, means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true. [¶] Include a special finding on that question in your verdict, using a form that will be supplied for that purpose.

(CT at 1747.)

The jury was properly instructed and the trial court's supplemental instruction did not create a mandatory presumption. Nor did trial counsel object. See Henderson, 431 U.S. at 154. Petitioner has failed to establish that the state court decision was contrary to Supreme Court authority. This claim is denied.

### 8.    Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective for failing to present evidence that Petitioner had a distinctive missing tooth that would have cast doubt on the identification; for failing to present evidence that White may have misstated her mother's name during the dying declaration; and for failing to discover impeachment evidence against a police officer witness. (Amended Petition at 5-6.)

33

### a.      Background

The Court of Appeal considered and rejected the first two aspects of petitioner' claim as follows:

> [Petitioner] contends that his attorney "was ineffective in failing to investigate and present admissible testimony regarding [his] missing tooth." He explains that his primary defense at trial was that he was misidentified by the victims at Johnny Rockets. After the defense had rested but prior to closing arguments, [petitioner's] attorney sought to reopen the case so that [petitioner's] investigator could testify that [petitioner] has a distinctive missing front tooth. He argued that the missing tooth was relevant because although distinctive, none of the victims included the missing tooth in their descriptions of the robber. In fact, one of the victims told the police that there was nothing unusual about the features of the robber's face. The trial court refused to reopen the case for this purpose because the investigator could not state that the tooth was missing on the night of the robbery. [Petitioner] contends that his sister, who testified at trial, could have testified that the tooth had been missing since childhood, and that his attorney's failure to investigate whether he could lay the necessary foundation with her testimony amounted to ineffective assistance of counsel . . . .

> [W]e agree that defense counsel's failure in this regard was harmless. Although two victims identified [petitioner's] in a photo line-up, the identifications were equivocal and both victims testified it was too dark for them to see the gunman's face clearly. The defense cross-examined the witnesses extensively to establish that neither could describe the features of the gunman's face with any particularity. However, the general description of the robber's race, build and height combined with the DNA evidence found on the bandana left behind, as well as [petitioner's] known relationship to White, provided compelling evidence of identification. The fact that [petitioner's] has a missing tooth which the witnesses failed to notice was not likely to have affected the outcome.

> [Petitioner] also contends that his attorney "was ineffective in failing to investigate and present evidence that Officer David Garcia had written in his report that Lenties White stated her mother's name was 'Sandra O'Neil' instead of correctly identifying her mother as Sandra McNeil." The evidence in support of this claim, however, is severely lacking. Officer Garcia did not attend to or speak with White on the bridge. He was responsible for compiling the official police report of the incident, which included among many witnesses' statements, those made by White to Officers Aschero and Pasquinzo while on the bridge. The officer's testimony and Aschero's incident report make clear that she heard White correctly identify her mother as Sandra McNeil. [Petitioner's] counsel was not ineffective in failing to introduce Garcia's apparent typographical mistake into evidence.

Brown, 2009 WL 2172811 at *23-24 (footnotes omitted).

### b.      Analysis

The Sixth Amendment to the United States Constitution guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of

United States District Court
Northern District of California

ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id.  To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, see id. at 691-94.

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 131 S. Ct. 770, 787 (2011) (quoting Strickland, 466 U.S. at 689).  The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential . . . and when the two apply in tandem, review is doubly so." Id. at 788 (quotation and citations omitted).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Three days after the crime, two of the victims identified petitioner as the robber with the gun from a photo spread containing six suspects.  (RT at 4076-79, 4084, 4089.)  As noted by the state court, trial counsel extensively cross examined these two witnesses.  Trial counsel elicited that both men failed to provide a description of the assailants to the 911 operator, other than their race, because it was too dark.  (RT at 2438-40, 2903-05.)  The witnesses also stated under cross-examination that they only saw part of the assailant's face and there was nothing unusual about his face.  (RT at 2435-38, 2904.)  Trial counsel also stressed this information during closing arguments.  (RT at 5116-19, 5125-26.)

It is debatable if trial counsel's performance was deficient for failing to present the missing tooth evidence, as he elicited much testimony regarding the ability of the witnesses to identify petitioner and described it in detail during closing argument.  Assuming that trial counsel was deficient, petitioner has failed to demonstrate prejudice.  The jury was presented with a great deal of evidence regarding the ability of the witnesses to identify the assailant in addition to expert

testimony regarding identifications.  Petitioner has not shown that adding the missing tooth evidence would have resulted in a different verdict.  In addition, there was the DNA evidence placing petitioner at the scene and the dying declaration of White that identified him.  Viewing all these factors the court cannot find that the state court opinion was an unreasonable application of Strickland.

Petitioner's claim regarding White misstating her mother's name after being struck by the car is meritless.  The officer who heard White make the statement wrote in her report that White stated the correct name, 'McNeil'.  The last name was mistakenly written in a report as 'O'neil' by an officer who did not speak or interact with White.  As the officer who spoke with White heard the correct name, trial counsel was not deficient for failing to present an argument concerning a police officer who did not even speak with White.  Trial counsel cannot be ineffective for failing to present a meritless argument.  See Sexton v. Cozner, 679 F.3d 1150, 1157 (9th Cir. 2012).  This claim is denied.

### c.        Failure To Discover Impeachment Evidence

The third component of this claim was brought in a habeas petition and denied by the San Francisco County Superior Court in a reasoned decision.  (Ex. 18 at 14.)  The superior court found that trial counsel was not ineffective for failing to discover impeachment evidence against a police officer witness.  (Id.)  As will be discussed in detail in petitioner's final claim below, the superior court found that the impeachment evidence could not have been discovered until 2010, five years after trial and was also unknown to the prosecution at the time of trial.  As will also be discussed below the impeachment evidence that was later discovered would not have changed the outcome of the trial.  Therefore, trial counsel could not have been ineffective for failing to obtain this information and this claim is denied.[11]

---

[11] Nor was trial counsel ineffective for failing to preserve these claims for review as the court has found the claims lack merit.

United States District Court
Northern District of California

### 9.     Exculpatory Evidence

Petitioner claims that the prosecution failed to disclose exculpatory impeachment evidence regarding San Francisco Police Department Inspector Casillas who testified against him, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  (Amended Petition at 6-7.)

#### a.     Background

In a separate and unrelated case the San Francisco District Attorney's Office revealed in the spring of 2010 that it had not been providing defense counsel with potential impeachment evidence of police officers who were testifying in criminal trials.  (Ex. 18 at 7.)  In October 2010, the District Attorney's Office sent a general letter to criminal defense attorneys stating that Inspector Casillas had potential <u>Brady</u> evidence in his personnel file.  (<u>Id</u>.)  This information was unearthed during discovery hearings regarding the police drug laboratory controversy in 2009 and 2010 and was not in the possession of the District Attorney at the time of trial.  (<u>Id</u>. at 11, n. 2.) The trial in this case occurred in 2005.

> The evidence that was not disclosed includes:
>
> [T]he fact that Inspector Casillas resigned from the police force while facing charges of an improper relationship with a deputy medical examiner and his dishonesty during an investigation of that relationship.  Additional possible impeachment evidence includes a charge that Casillas did a poor job in a 1987 investigation, that in 1999 he violated an *in limine* protective order, in 1998 he allegedly failed to disclose exculpatory evidence, also in 1998 he failed to follow proper police procedures, and in 2005 he withheld exculpatory evidence prior to a preliminary hearing.

(Ex. 18 at 5-6.)[12]

> Cassillas' role in petitioner's case included:
>
> .... [G]oing to Golden Gate Bridge on the night of the incident, conducting interviews of victims, and preparing and showing a photo lineup to the victims.  He also testified about the victims' comments when he showed them the photos.  He testified about other cases where trauma caused victims to have trouble making identifications, attempting to explain why some victims in this case could not identify Brown.
>
> Inspector Casillas also interviewed other witnesses, including codefendant and a suspect. He searched White's car pursuant to a warrant, and then testified as to what he found. Finally, he testified that he did not follow up on potential suspects who might be known as

---

[12] It is not clear from the record exactly when Casillas resigned, but the superior court noted the conduct or its discovery date occurred after trial.  (Ex. 18 at 11.)

United States District Court
Northern District of California

1    "S.B."  After trial it was discovered a "Mac Block" gang associate, Sherman Buchanan had
     the initials "S.B.," although his nickname was "Sherm."

2    (Ex. 18 at 6.)

3        The superior court considered and rejected petitioner's claim in a habeas petition:

4        First, there is no persuasive allegation of any substantial or prejudicial actual
         misconduct on the part of Inspector Casillas relating to the present case.  It is alleged
5        that Inspector Casillas was guilty of misconduct because he had entered into a
         personal relationship with an employee of a related agency, and that he previously
6        lied about that relationship.  This prior conduct or its discovery date occurred after the
         petitioner's trial and so would not have been available for use at trial.

7

8        There also are further allegations against Inspector Casillas that in prior cases he
         failed to disclose evidence, conducted a poor investigation, and failed to follow a
9        court order.  The evidence of previously conducting a poor investigation and the
         failure to follow a prior court order (apparently not thereafter punished by that court)
10       would not have been admitted at trial.  Conducting a poor investigation is a question
         of bad judgment or bad training, not moral turpitude dishonesty, and the prior court's
11       failure to sanction the inspector's disobedience suggests that there were mitigating
         circumstances.  Admission of such prior events would have unnecessarily developed
12       into two lengthy trials within the trial, and that evidence had scant probative value to
         be weighed against undue consumption of time and potential misleading effect.
13

14       In the absence of persuasive allegations in the present case of dishonesty or of
         misconduct by Inspector Casillas similar to the prior allegations, petitioner claims that
15       the general weakness of the evidence putting him in the car on the bridge left enough
         doubt that evidence about Casillas' claimed prior misconduct in other cases would
16       have made a difference in the present trial.

17

18       Specifically, petitioner argues that substantial doubt centers around the question of
         whether White actually said either "S.B." or "S.T." pushed her out of the car.  But
19       Inspector Casillas was not present when White told the uniformed officers who had
         pushed her out of the car, so the inspector could not have shed any light on what
20       White said.  The witnesses to the "S.B." statement were the uniformed officers on the
         bridge, not the Inspectors. Furthermore, Casillas was not the only inspector who had
21       been told that petitioner was known as "S.B.", since Inspector Camilleri was also told
         (RT 3559-60, 3573-74, 4071-75.)  Petitioner's sister established petitioner was known
22       as "S.B." and no other "S.B.'s" were linked to any of the events in this case.  Under
         California third-party liability law the fact that there might be other people with the
23       initials "S.B." would not be admissible in the absence of evidence actually linking
         such other persons to the Johnny Rocket robberies.  (People v. Bradford (1997) 15
24       Cal.4th 1229, 1325; People v. Hall (1986) 41 Cal.3d 826, 832.)

25

26       Any failure to investigate the possibility that "S.B." meant someone other than Brown,
         is irrelevant in light of petitioner's sister's statements that petitioner was known as
27       "S.B."  Furthermore, the mere existence of other people known as "S.B." would not
         exculpate petitioner, because the totality of the evidence left no substantial doubt that
28       petitioner was present in the car on the bridge that night.

United States District Court
Northern District of California

. . . .

> Also, it appears that both Inspector Casillas and Inspector Camilleri were witnesses to
> much of what Inspector Casillas testified to at trial.  Therefore, impeachment of
> Inspector Casillas with his alleged prior misconduct would not have substantially
> weakened the totality of the evidence concerning the police investigation conducted
> jointly by the two inspectors.  There is no persuasive assertion that Inspector Casillas
> acted unfairly or committed misconduct in this case.  He did not prevent or lead the
> defense away from conducting its own investigation in order to attack the evidence
> gathered by the police.

(Ex. 18 at 11-14.)

### b.      Analysis

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87.  The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).  Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Cone v. Bell, 556 U.S. 449, 469-70 (2009).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'"  Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).  "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."  Smith, 132 S. Ct. at 630-31 (finding impeachment evidence of prosecution's sole witness material); accord Agurs, 427 U.S. at 112-13 & n. 21.  And the mere possibility that undisclosed information might have been helpful to the defense or might have affected the outcome of the trial, does not establish materiality under Brady.  United States v. Olsen, 704 F.3d 1172, 1184 (9th Cir. 2013).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        In sum, for a Brady claim to succeed, petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Cf. Towery v. Schriro, 641 F.3d 300, 309-10 (9th Cir. 2010) (no habeas relief on Brady claim under § 2254 where state court reasonably determined "beyond a reasonable doubt that the prosecutor's misconduct did not affect the verdict").

        Petitioner has failed to demonstrate that the superior court denial of this claim was an unreasonable application of Brady and related cases. As the state court noted, there are no allegations of misconduct related to petitioner's case and some of the information, such as lying about a relationship, did not occur or was not able to be discovered until after trial. The remaining incidents of misconduct to the extent they would have been admissible to impeach the witness, fail to meet the elements of a viable Brady claim as petitioner cannot show the information was material and he suffered prejudice.

        That Casillas conducted a poor investigation on another unrelated case years before or failed to follow court orders would not have affected the verdict. Casillas' testimony and the evidence he discovered and presented were not crucial in this case and in many occasions were independently verified by other witnesses. As described above, Casillas was not present when White made her dying declaration and other witnesses corroborated that petitioner was known as SB. Assuming that the impeachment evidence was presented and the jury discredited all of Casillas' testimony, petitioner has not shown that the verdict would have been different. The DNA evidence, independent witness identifications and dying declaration evidence were separate from Casillas. While Casillas prepared and showed the photo lineup to the victims, there are no allegations of an improper or suggestive identification procedure. The Supreme Court has noted that evidence impeaching an eyewitness may not be material if there is other evidence strong enough to support the verdict. Smith, 132 S. Ct. at 630-31, Agurs, 427 U.S. at 112-13 & n. 21. As there was strong evidence in this case independent of Casillas and as he was not even a key witness, petitioner is not entitled to relief.

United States District Court
Northern District of California

### C.      Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has made such a showing only to the claims regarding the admission of evidence of his prearrest silence and the admission of the dying declaration, accordingly, a certificate of appealability will be granted only to those claims.

## IV.      CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is GRANTED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:  February 27, 2014

_____
JON S. TIGAR
United States District Judge